**LOMBARDO TURQUOISE MILLING AND MINING COMPANY, INC., a Nevada Corporation, Plaintiff,**

v.

**William G. HEMANES and Darlene Hemanes, his wife, d/b/a Silver Bell Turquoise Company, Defendants.**

**Civ. No. R–75–240 BRT.**

United States District Court, D. Nevada.

Feb. 24, 1977.

Bissett & Logar, Ronald Logar, Reno, Nev., for plaintiff.

McDonald, Carano, Wilson, Bergin & Bible, Paul A. Bible and Michael F. Mackedon, Fallon, Nev., for defendants.

## OPINION

BRUCE R. THOMPSON, District Judge.

This action was commenced on December 31, 1975. Plaintiff alleges ownership of the Windy 1, 3, 4, 5 through 16, and New Imperial 1 and 2 unpatented mining claims (hereafter the Windy Group). Plaintiff alleges the illegal location and possession by defendants of the following unpatented claims: Marie, Blue Mary, Blue Mary Extension, Darlene, Silver Bell No. 1, and Silver Bell No. 2, which conflict with his claims. Plaintiff prays for a temporary restraining order, a preliminary and final injunction, ejectment and damages. Plaintiff has waived a jury trial.

Defendants have answered and counterclaimed and have demanded a jury trial. They seek a decree quieting their title to the Marie and other claims located by them, a permanent injunction and damages.

The action came on for trial on plaintiff's motion for a preliminary injunction and has been fully presented, argued and briefed, and is ripe for decision on all issues. Seven trial days were devoted to the reception of evidence. The defendants did not stipulate that the hearing be consolidated with the trial on the merits.

Rule 65(a)(2), F.R.C.P., provides as follows:

"(a) Preliminary Injunction.

(2) Consolidation of Hearing with Trial on Merits. Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application. Even when this consolidation is not ordered, any evidence received upon an application for a preliminary injunction which would be admissible upon the trial on the merits becomes part of the record on the trial and need not be repeated upon the trial. This subdivision (a)(2) shall be so construed and applied as to save to the parties any rights they may have to trial by jury."

Pursuant thereto, the Court hereby orders that the trial of all equitable issues, not triable as of right with a jury, be advanced and consolidated with the hearing of the application for the preliminary injunction. The decree hereafter entered on such equitable issues shall be a final decree.

The prayers of all parties for injunctive relief plainly present equitable issues. Plaintiff's prayers for ejectment and dam-

ages are issues triable at law. Defendants' prayers for damages may be tried as of right by jury. Defendants' counterclaim for a decree quieting title, defendants being in possession, presents issues triable in a court of equity, and no jury may be demanded. *Thomson v. Thomson*, 7 Cal.2d 671, 62 P.2d 358, 117 A.L.R. 1 (1936); Annotation 117 A.L.R. 9; *Book et al. v. Justice Min. Co.*, 9 Cir., 58 F. 827 (1893).

In 1971, the Nevada Legislature drastically revised the Nevada mining laws. The present statutes provide, in pertinent part:

"517.030 Definition of boundaries; erection of monuments, claim markers; maps.

1. Within 20 days from the date of posting the notice of location, the locator of a lode mining claim shall define the boundaries of the claim by placing at each corner and at the center of each side line one of the monuments described as follows:

(a) The locator must define the boundaries of his claim by removing the top of a tree (having a diameter of not less than 4 inches) not less than 3 feet above the ground, and blazing and marking the same, or by a rock in place, capping such rock with smaller stones, such rock and stones to have a height of not less than 3 feet, or by setting a post or stone one at each corner and one at the center of each side line.

(b) When a post is used, it must be at least 4 inches in diameter by 4½ feet in length set 1 foot in the ground.

(c) When it is practically impossible, on account of bedrock or precipitous ground, to sink such posts, they may be placed in a mound of earth or stones, or where the proper placing of such posts or other monuments is impracticable or dangerous to life or limb, it shall be lawful to place such posts or monuments at the nearest point properly marked to designate its right place.

(d) When a stone is used (not a rock in place) it must be not less than 6 inches in diameter and 18 inches in length, set two-thirds of its length in the top of a mound of earth or stone 4 feet in diameter and 2½ feet in height.

(e) All trees, posts or rocks used as monuments, when not 4 feet in diameter at the base, shall be surrounded by a mound of earth or stone 4 feet in diameter by 2 feet in height, which trees, posts, stones or rock monuments must be so marked as to designate the corners of the claim located.

2. Within 90 days from the date of posting of the notice of location and in addition to defining the boundaries of the claim as set forth in subsection 1, the locator of a mining claim shall prepare two copies of a map of the claim which shall be of a scale of not less than 500 feet to the inch, and which shall set forth the position of the claim boundary monuments in relation to each other and establish numbers of the claim boundary monuments. Where the land has been surveyed by the United States, such description shall be connected by courses and distances to an official corner of the public land survey. Where the land has not been surveyed by the United States or where such official corners cannot be found through the exercise of due diligence, such description shall be tied by courses and distance to a claim location marker. The claim location marker shall be constructed at some prominent point visible from at least one claim corner. The claim marker site shall be chosen so that it will not be endangered by snow, rock or landslides, or other natural causes. Only one mineral claim marker is required for each contiguous group of claims. The claim marker shall be constructed in one of the following ways:

(a) If constructed of rock, it shall be 4 feet in diameter at its base and at least 4 feet in height, constructed upon bedrock wherever possible.

(b) A steel post at least 3 inches in diameter or thickness shall be set in the ground. After setting, the top of the post shall be 5 feet above the level of the terrain surrounding the base.

The description shall also state the township and range, and where the lands are surveyed lands, the section in which the mineral marker and the mining claim is situated. The locator need not employ a professional surveyor or engineer, but each locator shall prepare a map which is in accordance with his abilities to map and properly set forth the boundaries and location of his claim.

"517.040 Claim markers and maps: Specifications; filing, distribution of maps; filing fee. Within 90 days of the date of posting the location notice, the locator of a lode mining claim shall perform the following:

1. In addition to defining the boundaries of the claim as set forth in subsection 1 of NRS 517.030, the locator of a mining claim shall prepare two copies of a map of the claim which shall be of a scale of not less than 500 feet to the inch, and which shall set forth the position of the claim boundary monuments in relation to each other and establish numbers of the claim boundary monuments. Where the land has been surveyed by the United States, such description shall be connected by courses and distances to an official corner of the public land survey. Where the land has not been surveyed by the United States or where such official corners cannot be found through the exercise of due diligence, such description shall be tied by courses and distance to a claim location marker. The claim location marker shall be constructed at some prominent point visible from at least one claim corner. The claim marker site shall be chosen so that it will not be endangered by snow, rock or landslides, or other natural causes. Only one mineral claim marker is required of each contiguous group of claims. The claim marker shall be constructed in one of the following ways:

(a) If constructed of rock, it shall be 4 feet in diameter at its base and at least 4 feet in height, constructed upon bedrock wherever possible.

(b) A steel post or pipe at least 3 inches in diameter or thickness shall be set in the ground. After setting, the top of the post shall be 5 feet above the level of the terrain surrounding the base.

The description shall also state the township and range, and where the lands are surveyed lands, the section in which the mineral marker and the mining claim is situated. The locator need not employ a professional surveyor or engineer, but each locator shall prepare a map which is in accordance with his abilities to map and properly set forth the boundaries and location of his claim.

2. File the map with the county recorder in the county in which the claim is located together with a filing fee of $15 for each claim. The entire filing fee shall be utilized by the county to establish and maintain a county mining claim map that shall accurately record the location of all mining claims filed after July 1, 1971, which shall be a public record as provided in chapter 239 of NRS. The county recorder shall not refuse to accept a map submitted by the locator unless he can affirmatively show that the map submitted does not accurately reflect the location of all the claims.

3. The county recorder shall send one copy of the map and one copy of the location certificate to the county surveyor as soon as practicable after its receipt."

The instant case is a prime example of the imposition on federal district courts created by diversity of citizenship as a basis of jurisdiction. The new Nevada mining law has not been construed by the Nevada Supreme Court, except to hold it constitutional. *Barton v. DeRousse*, 91 Nev. 347, 535 P.2d 1289 (1975).

Before 1971, the Nevada law required the locator of a lode mining claim to perform location work on the claim within 90 days after location. NRS 517.040; NCL 4121.

The primary effects of the 1971 amendments were twofold: (1) to eliminate the requirement of the performance of location work; (2) to require the preparation and recordation of a map which would more accurately fix the location of the claim than under the previous statutory requirements. The principal issues of statutory interpretation here involved are: Is a mining claim absolutely void if the map prepared and recorded fails accurately to designate the township and range and section where the mining claim is located? (2) Does the recorded map control over the monumentation on the ground with respect to the true location and dimensions of the mining claim?

The hub of this entire case is the Marie claim. It is the claim which was occupied and worked by defendants. This activity of defendants instigated the commencement of this action by plaintiff.

The first portion of the Windy Group of claims, plaintiff's claims, was located by Hendrix and Hodges in April, 1972. They located and monumented Windys 1, 2, 3, and 4, and prepared and recorded certificates of location and maps which placed the claims with substantial accuracy in Section 27 and Section 27 and/or 22 R 47 E T 20 N. Windy No. 2 was abandoned when it was discovered that it conflicted with a prior valid location.

On September 11, 1972, plaintiff purchased a one-half interest in Windy claims 1, 3, and 4 from Hodges and wife, and purchased the other one-half interest from Hendrix on October 10, 1972.

In February, 1973, plaintiff located additional claims, Windy Nos. 5 through 16, and New Imperial Nos. 1 and 2. The situation of these claims as plotted by plaintiff's professional witness, James J. Owens, is shown on Exhibit 92.

Defendants' first claim, the Marie claim, was first located by Nalder and Hammon in August, 1972. The recorded certificate of location and map place the claim in Section 21, T 20 N R 46 E (Exs. 34 and 35). The claim was monumented. The recorded information about the claim was grossly in error. The claim as located on the ground was situated mostly in Section 22, with a tip in Section 27, T 20 N R 47 E. Thus, the County Surveyor's map and the recorded information in the County Recorder's office placed no one on notice of existence of the Marie claim at the place where it was situated. Plaintiff relies on other errors in the recorded descriptions of the location of the Marie claim, which are immaterial in the light of the gross errors already noted.

On October 23, 1973, defendant Hemanes entered into an agreement to purchase the Marie claim from the original locators, made a down payment, and the final payment, and took possession in April, 1974. He moved equipment on and started mining. Later in 1974, Hemanes located buffer claims, adjacent to the Marie claim, named the Blue Bell, Blue Mary, Blue Mary Extension, Silver Bell No. 1, Silver Bell No. 2, and Darlene. These claims are not important to the resolution of the disputes now before the Court, for reasons which will be hereinafter noted, so no detailed findings will be made respecting their monumentation and recordation. In the fall of 1974, Hemanes discovered that the Marie claim and buffer claims had been recorded in the wrong section and township, and in December, 1974, with the assistance of an engineer, Chilton, prepared and recorded amended certificates of location and an amended map, as authorized by law (NRS 517.200).

There is no disagreement between the parties with respect to the correct location on the ground of the Marie claim. The professional surveyors for both parties agree. Defendants' surveyor, Mr. Alan Means, prepared a map (Ex. 64). It shows the Marie claim and associated claims situated in Sections 21, 22, 27 and 28 T 20 N R 47 E, as follows:

Plaintiff's engineer, James J. Owens, also platted the location of the Marie claim (Ex. 93). Both used a scale of 1″ = 500 feet. When one chart is superimposed on the other, the substantial coincidence of the boundaries of the claim is demonstrated.

Also, there is no dispute between the parties (except for plaintiff's specious contention that the claim located by Nalder and Hammon was truly situated in Section 21) with respect to the actual physical location of the Marie claim on the ground. The twenty acres comprising the Marie claim are situated at the site of the old "King Diggings" (called by plaintiff the lower pit) which had been excavated by one Ralph King pursuant to an unperfected mining claim location made on February 19, 1972.

The dispute in this case arises because of plaintiff's contention that the Windy claims—four claims laid contiguously end to end and tied to a government survey marker, the quarter section marker between Sections 27 and 28, each location claiming a

length of 1,500 feet and a width of 600 feet for each claim, if resurveyed do in fact encompass the area occupied by the Marie claim. The claimed conflict is between Windy No. 4 and the Marie claim, and is demonstrated by plats prepared by plaintiff's engineers.

Defendants assert in opposition that Windy claims 1 through 4, as located on the ground by Hendrix and Hodges, did not in fact extend into Section 22 and did not conflict with the location of the Marie claim. Engineer Alan Means prepared Exhibit 66 which illustrates his reconstruction of the correct location of the Windy claims as monumented on the ground.

Defendants suggest as reasons for the discrepancy between the Hendrix and Hodges recorded map of the placement of their claims and the monumented claims on the ground, that in surveying the course of the claims they made no adjustment for magnetic declination (17½°) and in measuring the size of each claim they used a 100

foot rope. The claims are located in rough, mountainous country and measurement of distances by rope walking up and down ridges and ravines would result in shorter claims than the allowable length of 1,500 feet as compared with the airline measurement used by plaintiff and his engineers in replatting the claims. These reasons are appealing.

The most persuasive evidence is the testimony of the original locators of the claims. Eugene Hodges testified by deposition. Warren Hendrix testified at the trial. Hodges' testimony is not very clear inasmuch as he couldn't remember much about the monumentation of the Windy claims, but he was positive that the claims followed the ridge and most location monuments were near the top of the ridge, that they used a compass and rope, that Hendrix prepared the map, and that he visited the claims with Lombardo before Lombardo bought them, and while standing on Windy No. 4, they looked down the mountain at the King Diggings and Hodges told Lombardo that was Ralph King's property.

Warren Hendrix' testimony was more specific. They used a compass and rope and made no adjustment for magnetic declination. The King pit was 400 to 600 feet north of the north end line of Windy No. 4. On a photograph, Ex. 25, he marked the north end line of Windy No. 4. The Windy claims followed the ridge and corner posts were built on each side of the ridge. He had recently visited the property and saw the posts for the Marie claim and that claim was north of Windy No. 4 as he and Hodges had located it.

Both Nalder and Hammon, the locators of the Marie claim, testified. When they monumented the claim they saw no other posts except that Hammon saw two posts about 800 feet south of the Marie claim and that later Hendrix told him that those were Hendrix's posts.

From the foregoing evidence, the court finds that the location map recorded by Hendrix and Hodges (Ex. 5, also yellow area, Ex. 66) does not correctly define the boundaries of the Windy claims as located on the ground; that Windy No. 4, as located on the ground, did not encroach on the Marie claim as located by Nalder and Hammon, and that Lombardo knew these facts at the time he purchased the Windy claims.

*Plaintiff's suit is barred by the Nevada Statute of Limitations.*

The evidence establishes that in the fall of 1972, Hammon and Nalder worked on the Marie claim and enlarged the pit five times, working four to six weeks; that in 1973, they worked the claim for about thirty days; that in 1973, Hammon traded Lombardo a pound of turquoise for a jack hammer and told Lombardo the mineral came from the Marie claim; that Hemanes moved onto the claim in April, 1974, and mined through the summer, removing 160–200 pounds of turquoise; that in 1975, Hemanes mined from May 15th to the end of October, removing 50–75 pounds of turquoise; that because of adverse winter weather, claims in the Ackerman District can be worked only in the summer, late spring, and early fall; that Lombardo has never been in possession of the Marie claim; and that Lombardo knew about Nalder and Hammon and Hemanes' mining of the claim while it was in progress.

The Nevada statute (N.R.S. 11.060) provides:

"Action for recovery of mining claims: Occupation and possession; other applicable provisions.

1. No action for the recovery of mining claims, or for the recovery of the possession thereof, shall be maintained, unless it appear that the plaintiff, or those through or from whom he claims, were seized or possessed of such mining claims, or were the owners thereof, according to the laws and customs of the district embracing the same, within 2 years before the commencement of such action.

2. Occupation and adverse possession of a mining claim shall consist in holding and working the same, in the usual and customary mode of holding and working similar claims in the vicinity thereof.

3. All of the provisions of this chapter which apply to other real estate, so far as applicable, shall be deemed to include and apply to mining claims; provided,

(a) That in such application '2 years' shall be held to be the period intended whenever the term '5 years' is used; and

(b) That when the terms 'legal title' or 'title' are used, they shall be held to include title acquired by location or occupation, according to the usages, laws and customs of the district embracing the claim."

The regular statute pertaining to adverse possession of real property requires adverse possession for five years. (N.R.S. 11.070).

The special statute pertaining to mining claims has been in effect in Nevada since 1867. In *South End M. Co. v. Tinney*, 22 Nev. 19, 35 P. 89 (1894), the Supreme Court of Nevada held that the shorter limitation period of two years applies to both patented and unpatented mining claims, and, respecting the reason for the statute, said:

. . . "The main reason, too, for fixing a shorter period of limitation for mines than for other property, applies as well to patented claims as to those held by other titles. Other classes of real property are comparatively stable in value, and can be used and made productive at a comparatively small expense; but not so with mines. They are often only made to 'pay' by the expenditure of vast sums of money, and by this are sometimes changed from worthlessness to a value of many thousands of dollars. It is only justice that the holders of claims against this class of property should be required to assert them at an early day, to the end that they may not, in recovering their own, also reap too large a benefit from the enterprise of others. (*Oil Co. v. Marbury*, 91 U.S. 587, 592, 23 L.Ed. 328)."

In *Porter v. Tempa M. & M. Co.*, 59 Nev. 332, 93 P.2d 741 (1939), the Nevada Supreme Court discussed the application of the two-year statute to unpatented mining claims and sustained the findings of the trial court, saying:

"The trial court further found that while the defendant Diefendorf entered upon said claims in the year 1927, and thereafter did certain work thereon, the occupancy, holding, and working of said claims by the said Diefendorf did not continue openly, adversely, and notoriously for a period of two years thereafter, but was interrupted and broken by the coming upon the said claims by the owners thereof for the purpose of performing, and by the performance by them, of the annual labor required by law; and, further, that the entry or occupancy made by the defendant Diefendorf for the years 1927, 1928, 1929, 1930, 1932, 1933, and 1934 was interrupted and broken in each of said years either by the performance of annual labor by the owners or the filing by them of the notices of intention to hold required by law."

In *Wren v. Dixon*, 40 Nev. 170, 161 P. 722, 167 P. 324 (1916), the Nevada Supreme Court sustained the title acquired by adverse possession under the cited statute as against the claims of a plaintiff *sui juris*. Finally, in *Four Hundred and Twenty Min. Co. v. Bullion Min. Co.*, 3 Sawy. 634, 9 Fed.Cas. p. 592, No. 4,989 (1876), the Nevada Federal Court held that the Nevada statute of limitations relating to mining claims constitutes a part of the local laws by which the rights of the parties are to be determined and that adverse possession of unpatented claims for the time limited not only bars the remedy but extinguishes the right of the other claimant, justifying a decree quieting title in the adverse possessor.

The facts in the instant case fully support defendants' claim of adverse possession. From the fall of 1972 until December 31, 1975, when their possession was interrupted by this Court's temporary restraining order, defendants and their predecessors in interest openly, notoriously and adversely possessed, occupied, worked and mined the Marie claim according to the laws and customs of the Ackerman Mining District. Their possession was not interrupted by any activity of plaintiff, as in the

*Porter* case, supra, and plaintiff asserted no right to the claim until this action was instituted.

■ *The location of the Marie claim by Nalder and Hammon was not absolutely void because of the gross errors in description.*

The principal touchstone on this legal issue is *Claybaugh v. Gancarz*, 81 Nev. 64, 398 P.2d 695 (1965). That was a quiet title action by the senior locator against the junior locator of an unpatented mining claim. The statute then in effect required a miner to record a certificate of location within 90 days that met statutory requirements, else the mining claim location would be void. The certificate of location recorded by the plaintiff was found to be defective. Nevertheless, the Nevada Supreme Court reversed the trial court and held that the good faith of the senior locator and the bad faith of the junior locator justified a liberal construction of substantial compliance with the statutory requirements for recording a certificate of location. The Court said:

"However, with or without such statute, jurisdiction after jurisdiction has considered this question and has decided mining conflicts on the basis of the presence or absence of good faith. The purpose of the certificate is to impart constructive notice to subsequent locators of the existence of the claim, its location and extent, just as the markings upon the ground are intended to impart actual notice of the same facts. As to the parties having actual notice, as respondent did in this instance, the defects in the certificate, whatever they may be, are to be deemed immaterial. *Heilman v. Loughrin,* 57 Mont. 380, 188 P. 370, citing the Montana statute and 2 Lindley on Mines § 379 (3rd ed. 1914).

"In view of the increasing emphasis placed by the courts in recent years on the question of the good faith of the conflicting junior claimant and to excuse defects in the senior location if this is not shown, we hold that the existence of good faith in behalf of Claybaugh in the loca-

tion of the Nine-oh claim and the bad faith of Gancarz in the relocation of said claim preclude Gancarz from challenging the title of the good faith senior locator. The good or bad faith of the senior and junior locators was a real and important issue to be determined by the trial court.

"It was error for the trial court to grant respondent's motion to strike appellant's location notice and his location certificate. They were important items in support of his good faith. It was also error for the court to refuse to hear evidence concerning the lease to respondent in existence at the time respondent relocated over appellant's claim. Such evidence was relevant and material with reference to the asserted bad faith of respondent.

The trial court's explanation of its rulings that Claybaugh 'had nothing to lease' simply begged the question—whether Claybaugh's Nine-oh was or was not a valid subsisting claim.

As the record contains ample evidence of the good faith of appellant in the location of the Nine-oh and bad faith of the respondent in relocating the claim as the Gancarz, no purpose will be served in remanding the case for new trial.

The foregoing is without intent to indicate that this court would not, in the absence of such element of the junior locator's bad faith, hold the senior locator to a substantial compliance with the requirements of the statute as amended in 1941." . . .

*Cf. Columbia Standard Corp. v. Ranchers Explor. & Dev. Inc.,* 468 F.2d 547 (10 Cir. 1972).

The point is of importance because even if it should be held that the Windy No. 4 claim did not in fact occupy the area of the Marie claim, the other claims for which plaintiff filed certificates of location in February, 1973, do. If the Marie location is void because of the misdescriptions in the certificate of location, that ground was open to entry by a subsequent locator. *Gustin v. Nevada-Pacific Development Corp.,* 125 F.Supp. 811 (D.C.Nev.1954).

The plaintiff's bad faith in locating the additional mining claims is evident from the facts hereinabove reported in support of the findings on adverse possession.

■■■ Was it the intention of the Nevada Legislature when it enacted the 1971 amendments to the mining laws to overrule the good faith principles of the *Claybaugh* case? We think not. The 1971 Legislature reenacted N.R.S. 517.050 requiring recordation of a certificate of location in substantially the same form, including the specific language construed in *Claybaugh* declaring the location of a mining claim "absolutely void" for substantial non-compliance. The amendments made to N.R.S. 517.050 were those required by the substitution of the mapping requirement for the location work. (1971 Sts. of Nev. 2199–30). We infer that the *Claybaugh* interpretation was intended to apply to the amended statutes, that is, that equitable principles will be applicable in a contest between a claim jumper and a senior locator claiming under a defective location, and the demonstrated bad faith of the junior locator will preclude recognition of his claim to the property. Further, we observe that the 1971 amendments do not contemplate accuracy in mapping as a substitute for monumentation on the ground. The requirements of pre-existing law with respect to defining the boundaries of the claim (N.R.S. 517.030) were retained. The amendments to this section pertain to the substitution of a map for the location work. The amendments provide that where an official corner of the public land survey cannot be found after due diligence, the prospector may build a "claim location marker", a rock pillar four feet high or a steel post five feet high, and that only one mineral claim marker is required for each contiguous group of claims. The statute also says: "The locator need not employ a professional surveyor or engineer, but each locator shall prepare a map which is in accordance with his abilities to map and properly set forth the boundaries and location of his claim." From these provisions it is apparent that basic reliance was still to be placed on the monumentation of the claim and that the recorded map would not

necessarily be sufficient to give constructive notice of the place of its location. Thus the quoted language from *Claybaugh*, supra, is still applicable: "The purpose of the certificate is to impart constructive notice to subsequent locators of the existence of the claim, its location and extent, just as the markings upon the ground are intended to impart actual notice of the same facts. As to parties having actual notice, as respondent did in this instance, *the defects in the certificate, whatever they may be, are to be deemed immaterial.*" (Emphasis added).

On July 1, 1971, the Nevada Bureau of Mines and Geology issued a printed pamphlet containing questions and answers respecting the new mining law. The answers were reviewed and approved by the Attorney General of Nevada. This is persuasive authority in the absence of more controlling precedent. Question and Answer 19 are as follows:

"Q. If I make a mistake in plotting my claim(s) on the map or in tying to the land corner or claim location marker, does this invalidate my claim?

"A. No, the claim monuments on the ground always mark the legal position of the claim. However, if a mistake is discovered, a new, correct map must be filed, in order to comply with the law."

■■■ Each case of this character must be decided on its facts. In the usual case every senior locator will be held "to a substantial compliance with the requirements of the statute" (*Claybaugh*, supra, 81 Nev. at p. 81, 398 P.2d at p. 705).

■■■ *The correct dimensions and locations of an unpatented mining claim are fixed by the monumentation on the ground, not by the recorded map.*

The Court has found that the Windy No. 4 claim, as located on the ground, did not encroach on the Marie claim, as located on the ground. It is probable that a resurvey of the Windy claims and the Marie claim extending them to the full length claimed

for each location (1,500 feet), would prove some encroachment irrespective of whether the Windy claims are platted along the ridge line, an adjustment for magnetic declination having been made, or are platted as shown on the Hendrix and Hodges recorded map (Ex. 5). See also Ex. 66. Thus, we must decide whether the claims as monumented and located on the ground prevail over the recorded descriptions.

▪ The Nevada law is clearly stated in *Gray et al. v. Coykendall et al.*, 53 Nev. 466, 6 P.2d 442 (1931). The court said:

"It was said in *Treadwell v. Marrs*, 9 Ariz. 333, 83 P. 350, 355, on an issue as to the location of a mining claim, 'that, where the monuments are found upon the ground, or *their position or location can be determined with certainty*, the monuments govern, rather than the location certificate; but where the course and distances are not with certainty defined by monuments or stakes, the calls in the location notice must govern and control.' This is a salutary and well-settled rule *calculated to require the best evidence of the true boundaries* of a claim, and *to prevent the swinging or floating of claims to the detriment of subsequent locators.* Of course inaccuracies or mistakes in a mining location will not invalidate the location, and in such cases monuments originally erected on the ground control the courses and distances. *Book v. Justice Min. Co.* (C.C.) 58 F. 106; *Gibson v. Hjul*, 32 Nev. 360, 108 P. 759. It is by such means that mistakes may be made known. But this applies only where the monuments or stakes can be clearly ascertained, otherwise the description in the location notice controls. *Swanson v. Koeninger*, 25 Idaho 361, 137 P. 891; *Tiggeman v. Mrzlak*, 40 Mont. 19, 105 P. 77; *Flynn Group Min. Co. v. Murphy*, 18 Idaho 266, 109 P. 851, 138 Am.St. Rep. 201; *Thallman v. Thomas* (C.C.) 102 F. 935; Lindley on Mines (3d ed.), sec. 375; 40 C.J. 807." (Emphasis supplied)

See also: *Cardoner v. Stanley Consol. Min. & Mill Co.*, 193 F. 517 at 519 (D.Idaho 1911). The authorities on this point were fully collated and discussed in the dissenting opinion of Justice Harnsberger in *Masek v. Ostlund*, 358 P.2d 100 (Wyo.1960). No useful purpose would be served by repeating them here.

▪ The problem in application of the law to the facts of this case is one of the sufficiency of the proof. With respect to the location on the ground of the original Windy Claims, about the only points of reference which everyone found were the government survey section marker between sections 28 and 27 and the location monument for Windy No. 1. Hendrix and Hodges testified that they had fully monumented the claims. Lombardo testified that he had fully reconstructed and reestablished all corners and center posts and location monuments after he purchased the claims. Yet, few of these could be found and none clearly identified by disinterested witnesses who carefully examined the claims early in 1976. The suspicion is that monuments were destroyed. In the light of Lombardo's testimony, the testimony of James J. Owens, Engineer, is incredible; not that he didn't find what he said he found, but his identification and characterization of his findings are unbelievable. The only boundary of the Windy claims here in contention is the north end line of Windy No. 4. The best evidence of the true location of that end line, well south of the Marie claim, is the testimony of Hendrix, Hodges, Hammon, and Nalder. The testimony of other witnesses that Lombardo disavowed any encroachment on the Marie claim is also credited. Lombardo's acquiescence in the mining activity on the Marie claim is corroborative. In sum, overwhelming evidence establishes with certainty the location on the ground of the north end line of Windy No. 4. That evidence controls.

All the prospectors involved in this lawsuit were experienced miners. It is common knowledge that a miner, locating a claim, almost uniformly claims by written description the full distances authorized by federal and state law, that is, 1,500 feet in length and 600 feet in width. That is the case here. The monumentation on the

ground did not encompass the full area authorized. It controls. Thus the locators of the Marie claim are the senior locators and the locators of the Windy claims and Imperial claims are the junior locators.

 Plaintiff cites *Allen v. Laudahn,* 59. Idaho 207, 81 P.2d 734, for the proposition, in substance, that the locator of a mining claim is incompetent to testify in impeachment of his recorded title. The opinion is inapposite. It pertains to testimony by the original locator that he had not made a discovery of valuable mineral. The reported decisions are replete with testimony respecting the situation of the claim on the ground vis-a-vis the recorded description, most of which are discussed in *Masek v. Ostlund,* supra. Lombardo did not rely on the Hodges and Hendrix map when he bought the Windy claims. Hodges told him that the claim down below was the Ralph King property. While it may well be that a locator cannot deny that he made a discovery to invalidate a recorded title which he conveyed, the law is clear that satisfactory proof of the actual location of a mining claim will prevail over the calls and distances of the recorded description.

*The evidence does not support any form of equitable relief with respect to the buffer claims.*

Our conclusions from the foregoing are that defendants are the owners of the Marie claim and are entitled to a decree quieting title and enjoining plaintiff from any use or occupancy of the property. The allegations and prayers of the complaint and counter-claim seek relief as to other claim locations.

The locations and conflicts are demonstrated by the official County Surveyor's status map (Ex. 16), corrected to July 31, 1975.

| YEAR | CLAIM NAME | SYMBOL | LOCATOR |
|------|------------|--------|---------|
| 1973 | WINDY | W | LOMBARDO MINING |
| 1973 | NEW IMPERIAL | NI | " |
| 1973 | BLUE STONE | BS | " |
| 1974 | BLUE MARY | BM | W.G HEMANES |
| 1974 | BLUE BELL | BB | " |
| 1974 | MARIE | M | " |
| 1975 | BLUE MARY EXT | BME | " |
| 1975 | SILVER BELL | SB | " |
| 1975 | GREENSTONE | GS | S K BROWN |
| 1975 | DARLENE | D | W.G. HEMANES |
| 1975 | WARD | WD | B. WARD |

This map was, of course, prepared from the recorded descriptions. There are no conflicts in issue except as follows: Some of Lombardo's Windy and Imperial claims overlap in whole or in part Hemanes' locations of Blue Bell, Marie, Darlene, and Silver Bell No. 1 and No. 2. To the extent no conflict is shown, no claim for relief has been stated or proved.

 With respect to the conflicting claims, no case for equitable relief has been proved because there is no proof of the discovery of any valuable mineral. Defendants' proof of discovery was limited to the Marie claim on which the existence of valuable mineral is unquestionable. With respect to plaintiff, proof of the existence of valuable mineral was limited to Windy No. 3, Windy No. 7, and Windy No. 4. There is no conflict between Windy No. 3 and No. 7 and defendants' claims, and the paper conflict between Windy No. 4 and the Marie claim has been resolved. True, in response to counsel's question, plaintiff's president, Lombardo, testified that he had made a discovery on each of his Windy and Imperial claim locations. Such a conclusory statement, even if believed, is not competent proof of a discovery of valuable mineral.

 The discovery of a valuable mineral is essential to the validity of an unpatented mining claim. 30 U.S.C. § 22, 30 U.S.C. § 23; *Union Oil Co. of California v. Smith*, 249 U.S. 337, 39 S.Ct. 308, 63 L.Ed. 635 (1919); *Davis v. Nelson*, 329 F.2d 840 (9 Cir. 1964). Each lode claim must be independently supported by a discovery of valuable mineral within the limits of the location as it is marked on the ground. *Gwillim v. Donnellan*, 115 U.S. 45, 50, 5 S.Ct. 1110, 29 L.Ed. 348; 2 *Lindley on Mines*, Sec. 337, p. 778; 1 *American Law of Mining*, Sec. 4.15 pp. 612–14. In the latter text, the authors stated (p. 613):

"A claimant who holds a number of mining claims as a group must have a discovery on each claim. He cannot establish the validity of one claim merely by showing a valid discovery on a contiguous claim, whether owned by another or by himself, nor is it sufficient to show that all of the claims taken as a group satisfy the requirements of a discovery. Under the prudent man rule, the claimant must show a reasonable prospect of success in developing a valuable mine on each claim. This means that each claim, to be valid, must be capable of being operated at a profit independently of any other claim." . . .

Absent proof of discovery, injunctive relief should be denied inasmuch as there is no showing of irreparable injury, or, for that matter, of any injury whatsoever. As stated in *Davis v. Nelson*, supra, the defensible rights of a locator before a discovery depend on actual possession and working the

prospect. Constructive possession flowing from a paper title is insufficient. In fact, the common practice of locating buffer claims contiguous to a valid claim where the only discovery has been made should be judicially disapproved and no such claims should receive judicial support in the form of equitable relief.

By the same token, an equitable decree quieting title cannot be entered in an action between contesting private claimants to unpatented ground unless the prevailing party proves the discovery of valuable mineral within the boundaries of his claim. Absent such proof, he has not proved ownership or title to the ground. *Garibaldi v. Grillo*, 17 Cal.App. 540, 120 P. 425 (1911).

In consideration of the premises, and good cause appearing,

IT HEREBY IS ORDERED:

1. A final judgment and decree shall be entered quieting defendants' title to the Marie claim, as hereinabove described, and permanently enjoining plaintiff, its officers, agents, successors and assigns, from entering upon said claim or interfering with defendants' possession and enjoyment thereof. The Court, pursuant to Rule 54(b) F.R.C.P., expressly determines that there is no just reason for delay and expressly directs the entry of a final judgment as aforesaid.

2. Plaintiff's motion for a preliminary injunction is hereby denied.

3. Defendants' motion for a preliminary injunction as to all claims except the Marie claim is hereby denied.